UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MIKE COLLINS,<br>_Address:_ 9006 Meadow Place<br>Savage, MN 55378 | ) ) ) ) | |
| | ) | Case No: |
| FRANK GREENE, and<br>_Address:_ 4740 6th Place, N.E.<br>Washington, DC 20017 | ) ) ) ) | **CLASS ACTION COMPLAINT**<br><br>(1) **VIOLATIONS OF RICO, 18 USC §§** |
| | ) | **1962(c) and (d)** |
| NATURES DISCOUNT, INC.,<br>_Address_: 15929 Biscayne Boulevard<br>Aventura, FL 33160-4605 | ) ) ) ) | (2) **BREACH OF FIDUCIARY DUTY**<br>(3) **AIDING AND ABETTING**<br>     **BREACH OF FIDUCIARY DUTY**<br>(4) **AIDING AND ABETTING FRAUD** |
| Individually and on behalf of all others<br>similarly situated, | ) ) ) | (5) **DECLARATORY AND**<br>     **INJUNCTIVE RELIEF**<br>(6) **EQUITABLE ACCOUNTING** |
| Plaintiffs,<br>v. | ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| ADSURFDAILY, INC., | ) ) | |
| BANK OF AMERICA, N.A., | ) ) | Case: 1:09-cv-00100 |
| THOMAS ANDERSON BOWDOIN, JR., | ) ) | Assigned To : Collyer, Rosemary M.<br>Assign. Date : 1/15/2009 |
| WALTER CLARENCE BUSBY JR., and | ) ) | Description: General Civil |
| ROBERT GARNER, | ) ) | |
| Defendants. | ) ) ) | |

**CLASS ACTION COMPLAINT**

Plaintiffs Mike Collins, Frank Greene, and Natures Discount, Inc., by and through their

attorneys, file this Class Action Complaint against AdSurfDaily, Inc., Thomas Anderson

Bowdoin, Jr. ("Bowdoin"), Walter Clarence Busby Jr. ("Busby"), Robert Garner ("Garner"),

(collectively referred to herein as the "RICO Defendants") and Bank of America, N.A. ("Bank of

America") on behalf of itself and other similarly situated individuals or businesses who paid

money to fraudulent schemes operated by the RICO Defendants and aided and abetted by Bank of America, and were damaged thereby. Upon information and belief, as well as the investigation of counsel, Plaintiffs allege as follows:

## INTRODUCTION

1.     The RICO Defendants devised, perpetrated and/or operated an illegal Internet-based marketing scheme that obtained tens of millions of dollars from Plaintiffs and Class members throughout the United States who paid money to AdSurfDaily, AdSurfDaily Cash Generator, Golden Panda Ad Builder, and La Fuente Dinero (collectively referred to hereinafter as "ASD") for so-called "ad packages" that conferred membership in ASD's program. The RICO Defendants falsely promised Plaintiffs and Class members an innovative Internet marketing opportunity that would promote and drive traffic to ASD members' websites. The RICO Defendants also promised that ASD members could earn significant rebates and returns on fees paid to ASD by viewing Internet advertisements through ASD's program.

2.     According to lawsuits recently filed by Federal and State law enforcement authorities and a ruling by the Honorable Rosemary M. Collyer of this Court that has halted ASD's operations, ASD is nothing more than an online pyramid scheme or multi-level marketing operation (commonly referred to as a "Ponzi" scheme) and not a legitimate business enterprise. The funds to pay the promised large returns to existing members are generated only through the addition of new members. It is estimated that over 100,000 individuals and businesses have been victimized by this illegal scheme. Although the scheme operates primarily over the Internet, significant money has been raised at ASD rallies in Miami, Chicago, Tampa, and at other locations throughout the United States where tens of millions of dollars were collected from thousands of rally attendees.

3.     From ASD's inception in November 2006, Defendant Bank of America played an integral role in ASD's operations and success. While other financial institutions and payment processors refused to facilitate ASD's fraud, Bank of America, even in the face of significant banking best practices "red flags" and likely violations of the Bank Secrecy Act and relevant

anti-money laundering regulations, not only conducted business with ASD and the RICO Defendants, but it also substantially assisted the expansion of the ASD scheme. For example, Bank of America has: (1) facilitated the deposit of millions of dollars of funds to ASD and the RICO Defendants; (2) approved and enabled one or more of the RICO Defendants to maintain at least ten accounts at Bank of America where thousands of checks and money orders from ASD members, totaling millions of dollars, were deposited; (3) provided a wire transfer facility for funds to be deposited into one or more of the RICO Defendants' Bank of America accounts from anywhere in the United States; (4) provided training to ASD employees regarding automated clearinghouse tasks; and (5) allowed ASD to utilize the imprimatur of its affiliation with Bank of America on ASD's websites. Instead of heeding numerous tell-tale warning signs of illegitimate and likely criminal conduct, Bank of America enmeshed itself with the ASD operation, and providing ASD with an air of legitimacy that launched ASD and thereafter fueled the rapid growth of the RICO Defendants' scheme to defraud.

4.     An investigation of ASD and the RICO defendants by Bank of America as is dictated by various anti-money laundering laws and banking best practices, would have set off alarm bells either requiring further inquiry into the legitimacy of this massive Ponzi scheme or a decision to cease doing business with these entities. Instead, Bank of America aided and abetted the ASD scheme and the RICO Defendants in the face of the following facts: (1) the criminal history of both Bowdoin and Busby relating to investment fraud; (2) Bowdoin's history of multiple failed and questionable business ventures; (3) the lack of legitimate business operations capable of generating tens of millions of dollars that were deposited in the RICO Defendants' Bank of America accounts in a relatively brief period of time; (4) multiple accounts having the same signatory and using "doing business as" account names; (5) large numbers of small transaction generating millions of dollars of deposits in a short time period; (6) a business address that does not exist; (7) an Internet-based business model that does not involve selling any products; (8) a large number of transfers among related accounts; and (9) purchases of personal luxury products from business accounts. Several of these facts are clear indicators of "Money

Laundering Red Flag," as recognized in the Office of the Comptroller of the Currency's 2002 publication, "Money Laundering: A Banker's Guide to Avoiding Problems." At least one other financial institution has closed an account held by Bowdoin or a family member after its investigation revealed that Bowdoin appeared to be operating a Ponzi scheme. Also, Visa has often refused its cardholders' use of Visa cards to pay for ASD ad packages because Visa characterized these purchases as "suspicious." Similarly, the popular PayPal system could not be used to purchase ad packages from ASD.

5.      The RICO Defendants built the ASD scheme on misrepresentations and false statements to Plaintiffs and Class members relating to the legitimacy of ASD as a bona fide Internet advertising program. These misrepresentations perpetrated a scheme to defraud and to obtain money by means of false or fraudulent pretenses. In connection with that scheme, the RICO Defendants have committed wire fraud and money laundering. The RICO Defendants' conduct and conspiracy violates the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, et seq. ("RICO"). The RICO Defendants have breached a fiduciary duty to Plaintiffs and Class members.

6.      Bank of America's failure to follow recognized industry standards for compliance with anti-money laundering laws and banking regulations in connection with opening, maintaining, and servicing accounts of the RICO Defendants has aided and abetted the breaches of fiduciary duty and fraud committed by the RICO Defendants.

7.      Plaintiffs bring this action seeking monetary damages for the injury to their and the Class members' business or property caused by the RICO Defendants' violation of RICO and breach of fiduciary duty, declaratory and injunctive relief to end the unlawful scheme and prevent further losses, and an accounting. Plaintiffs also bring this action seeking monetary damages for the injury to Plaintiffs and Class members caused by Bank of America's violations of common law.

/ / /

/ / /

### JURISDICTION AND VENUE

8.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331-32 and 18 U.S.C. §1964. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367. This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §1965(b) and (d). The aggregate amount in controversy exceeds $5,000,000, and less than two-thirds of all Class members reside in the District of Columbia.

9.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) and (b). Venue is also proper under 18 U.S.C. §1965(a) because all Defendants transact or have transacted business in this District at times materials to this action.

10.     This action involves common issues of fact and grows out of the same events and transactions as two cases brought by the United States Attorney's Office for the District of Columbia and pending before the Honorable Rosemary M. Collyer – Case No. 1:08-CV-01345-RMC and Case No. 1:08-CV-02205-RMC – and is a related case within the meaning of Local Rule 40.5(3).

### PLAINTIFFS

11.     Mike Collins is a resident of Savage, Minnesota. In July 2008 Collins paid $1,000 to ASD for the purchase of purported advertising packages.

12.     Frank Greene is a resident of Washington, District of Columbia. In July 2008 Greene paid $550 to ASD for the purchase of purported advertising packages.

13.     Natures Discount, Inc. (hereafter "Natures Discount") is a Florida corporation. Natures Discount operates one store in Miami and has 15 locations throughout the Caribbean. In June and July of 2008, Natures Discount paid amounts totaling $7,500 to ASD for the purchase of purported advertising packages.

### DEFENDANTS

14.     AdSurfDaily, Inc. is a "person," within the meaning of RICO. AdSurfDaily, Inc. is a Nevada corporation, incorporated December 14, 2006. T. Andy Bowdoin of Quincy, Florida and Robert F. Garner of Greensboro, North Carolina are officers of the corporation.

15. Bank of America, National Association is a subsidiary of Bank of America Corporation, a Delaware corporation headquartered in Charlotte, North Carolina. Bank of America provides a diverse range of banking services in 32 states and the District of Columbia. Bank of America has a branch at 1321 W Jefferson Street in Quincy, Florida, as well as multiple locations in Washington, D.C.

16. Thomas Anderson ("Andy") Bowdoin, Jr., dba AdSurfDaily and AdSurfDaily Cash Generator, is a "person," within the meaning of RICO, 18 U.S.C. §§1961(3) and 1962(c). Bowdoin controls and, with others, operates ASD. Bowdoin filed or caused to be filed papers to incorporate AdSurfDaily, Inc. in Nevada on December 14, 2006, and establish T. Andy Bowdoin, LLC in Nevada on December 15, 2006. At all times relevant hereto, Bowdoin has been the CEO and President of AdSurfDaily. Inc. From its inception until July 17, 2008, Bowdoin was an owner and President of Golden Panda Ad Builder, Inc., formerly incorporated in Georgia. Bowdoin is a resident of Quincy, Florida.

17. Walter Clarence Busby Jr. is a "person," within the meaning of RICO. Busby is the Chief Executive Officer and most recent President of Golden Panda Ad Builder, Inc. Busby is a resident of Acworth, Georgia.

18. Robert Garner is a "person" within the meaning of RICO. Garner is an attorney licensed in North Carolina and identified in ASD materials as ASD's outside counsel. Garner is a director of AdSurfDaily, Inc. and a manager of T. Andy Bowdoin, LLC. Garner is a resident of Greensboro, North Carolina.

## FACTS

### Internet Auto-Surf Ponzi Schemes

19. The Internet advertising auto-surf scheme is one digital variant of the classic Ponzi scheme and has become well known to law enforcement. According to the Securities and Exchange Commission ("SEC"), these schemes operate in this way:

> "Auto-surfing" is a form of online advertising that purportedly generates advertising revenue for companies that want to increase traffic to their websites. The premise behind auto-surfing is that companies that advertise

on the Internet are willing to pay to increase traffic to their web sites. These companies hire an auto-surf firm or "host," which in turn pays individual web surfers to view certain websites on an automatically rotating basis. The more sites the individual visits, the more money he or she stands to earn.

SEC, http://www.sec.gov/investor/pubs/autosurf.htm.

20.     The risk of such an "auto-surfing" scheme comes when the organizer, in this case ASD, requires members to pay to participate. As the SEC warns:

> While auto-surfing may sound easy and appealing — and risk-free — there can be a hitch. Some auto-surf programs require their surfers to pay to participate, although perhaps not initially. When you first sign up to auto-surf, the firm might assign a limited number of sites for you to visit and pay you accordingly. Once you've made a modest amount of money, the firm might encourage — or even require — you to purchase a "membership" so that you can maximize your earnings. The program will promise high — often double or triple digit — returns on your investment in the program, often within days or weeks of joining. The line you'll hear is that the more you click, the more you collect. But the reality is that any scheme that requires you to pay to participate — and promises handsome rewards in no time at all for little to no effort on your part — bears many of the hallmarks of a "Ponzi" or pyramid scheme.

SEC, http://www.sec.gov/investor/pubs/autosurf.htm.

**The RICO Defendants' Development of the ASD Auto-Surf Scheme**

21.     Bowdoin, Garner and other co-conspirators devised the ASD's auto-surf scheme and incorporated AdSurfDaily, Inc. in a plan to develop the largest Internet auto-surf scheme. ASD has operated over the Internet at various sites, including www.adsurfdaily.com, www.asdcashgenerator.com, and www.lafuentedinero.com.

22.     Initially from October 2006 through March 2007, ASD offered a scheme at the website www.adsurfdaily.com by which it agreed to repay 150% of the amount a member paid for purchasing an ad package, so long as the member would view several websites that ASD rotated through the member's website browser. ASD agreed to pay members even more as a commission when members referred others to the ASD scheme. ASD also agreed to reserve 60% of the gross revenue it received from each day's sales (additional member money and new member money) to pay member rebates. In 2007, after it temporarily shut down due to the

inability to fund member rebates and commissions and due to performance issues with the ASD auto-surf program, ASD launched a new website, www.asdcashgenerator.com, using the same facilities, bank accounts at Bank of America, and other auto-surf mechanisms. This more recent iteration of the operation offers to repay members less: 125%, not 150%, of the membership fee. Further, ASD agrees to reserve only 50% of the gross revenue received from each day's advertisement sales to pay member rebates. This new iteration maintains a referral commission structure. ASD also operates with similar terms La Fuente Dinero, a Spanish language version of its scheme, at www.lafuentedinero.com.

23.     The RICO Defendants also sought to expand further their unlawful scheme by attracting new members and soliciting additional money from existing members through marketing an auto-surf program targeted for advertising in China. This venture, Golden Panda Ad Builder, Inc., of which Busby was the Chief Executive Officer, has operated at www.goldenpandaadbuilder.com beginning on or about July 23, 2008, but it was conceived of and promoted by the RICO Defendants for months prior to its website's premier. Golden Panda Ad Builder, Inc. was incorporated in Georgia on May 15, 2008, and dissolved on September 24, 2008.

24.     ASD promotes that its program provides three ways for members to earn money: (1) earning rebates from ASD by auto-surfing advertisements served by ASD; (2) earning commissions by referring other members to the ASD program; and (3) selling products or services from members' own websites advertised on ASD. ASD represents that by participating in ASD, members can break out of the job market and earn more money than most people earn working 40 hours per week. The RICO Defendants knew that most, if not all, of any money realized by members comes from either rebates for viewing advertisements or referral commissions, and not selling products or services by legitimate advertising.

25.     ASD promises that members will "enjoy daily rebates and earn far above-average earnings" merely by spending 7-15 minutes per day viewing 24 websites in the ASD program.

26.     ASD members must purchase ad packages to be eligible for the rebates and referral commissions ASD promises. Each dollar in an ad package translates to one credit; the number of credits determines how many times ASD rotates a member's website to other members for viewing. For example, a member's website will be rotated for auto-surfing by other members one time per credit until all credits have been used. Therefore, the larger the ad package purchased, the more times ASD supposedly makes the website available for other members to view. ASD imposes a minimum ad package amount of $10. Over the course of its operations, ASD has steadily increased the maximum value of an ad package a member may purchase at any one time, with the amount ranging from $7,000 to $50,000.

27.     ASD lists on its website www.adsurfdailybreakingnews.com the "sales" and "rebate percentages" for each day from March 2008 through June 2008. These rebate percentages range from .50% to 1.58%.

28.     ASD promises rebates based on a percentage of the value of the ad package purchased, up to a maximum set percentage. ASD initially promised that members would earn up to 150% in rebates. ASD later reduced the maximum percentage to 125%. ASD states that when a member earns the maximum rebate percentage, the original ad package expires. In other words, ASD promises that a $5,000 ad package can earn a rebate of 1%, or $50, per day up to the maximum rebate percentage in effect at the time. Accordingly, when the maximum rebate is 125%, and assuming a constant daily rebate of 1%, the $5,000 ad package expires in 125 days. ASD advocates that members use the daily rebates to repurchase or upgrade ad packages, which would enable the members to continue purportedly to earn rebates on the unexpired portion of these additional ad packages purchased.

29.     ASD members can only earn rebates and commissions by purchasing ad packages and auto-surfing ASD websites as described below. ASD solicits members by highlighting that there are no membership fees; however, ASD restricts the ability of free members to earn commissions and cash out purported earnings. Thus, in order to even be eligible for the

promised benefits of the program, members must upgrade to a paid membership. For example, at various times, ASD imposed the following membership levels:

| Membership Levels | Select Membership Features |
| --- | --- |
| Free Membership (Trainee) | Cash-out allowed only on Mondays and 3% referral commission for 1st level. Must pay a 2% withdrawal fee to receive cash-out. |
| $10/Month Fee (Executive) | Cash-out allowed only on Mondays and 5% referral commission for 1st level and 3% referral commission for 2nd level. |
| $25/Month Fee (VIP) | Cash-out allowed only on Mondays, Wednesdays and Fridays and 7% referral commissions for 1st level and 4% referral commission for 2nd level. |
| $100/Month Fee (Executive VIP) | Cash-out allowed daily and 10% referral commissions for 1st level and 5% referral commissions for 2nd level. |

30.    Over time ASD has added additional membership levels as a means for collecting additional funds and to expand the structure of ASD's pyramid. As shown in part in the previous paragraph, the categories of membership include various amounts of monthly dues, various commissions for referrals, various surfing requirements, and for some categories, reduction or elimination of processing fees when cashing-out rebate earnings. The convoluted and elaborate details of the scheme add an ever-growing list of limitations between ASD members and the returns the RICO Defendants promise.

31.    By offering commissions for referrals, ASD encourages members to recruit new members. ASD claims to pay the source of a referral a percentage of each newly referred member's ad package purchase. Such is a hallmark of a typical pyramid scheme. The amount of commission promised depends upon membership level of the referring member. The RICO Defendants claim that the ability to earn referral commissions is a very lucrative aspect of the program for ASD's members.

/ / /

/ / /

10

**The RICO Defendants' Marketing, Solicitation and Training of Members**

32.     ASD has members across the country and around the world because it operates primarily over the Internet. Members obtain account information and track the purported value of their ASD account by signing on to ASD's websites.

33.     The RICO Defendants market ASD and solicit members to participate in ASD through grassroots campaigns on the Internet. The RICO Defendants transmit marketing materials on ASD's Internet sites, promulgate marketing videos on sites such as You Tube, and host web conferences. The RICO Defendants infuse these various grassroots campaigns with misrepresentations to lure members into ASD's fraudulent scheme.

34.     The RICO Defendants have also used the Internet to advertise in-person ASD rallies conducted across the United States designed to attract additional members to ASD, and thus to increase the pyramid scheme. These rallies additionally provide forums for the RICO Defendants' distorted misrepresentations about the nature of the ASD scheme.

35.     Through Internet advertisements, ASD solicits members by encouraging attendance at rally events and by promising that such attendance confers additional membership benefits, such as earning bonus credit. ASD offered several promotions for rally attendance, including a 50% discount on ad packages. In other words, members at a rally pay $1,000 to purchase a $2,000 ad package, and the ASD rebate program would purportedly allow earnings of 1% per day on $2,000.

36.     In marketing materials conveyed over the Internet and at in-person rallies, ASD stresses the reputation and experience of founder Defendant Bowdoin. The RICO Defendants highlight Bowdoin's alleged 45 years as a business owner and entrepreneur, claiming that he has developed and run several successful businesses and trained thousands of sales people across the United States. The RICO Defendants also strongly emphasize that ASD membership confers the opportunity to "lock arms" with Bowdoin and thus benefit from his impeccable reputation and business acumen.

37.     The financial results of three recent ASD events purportedly indicate sales of over $29 million from a Tampa, Florida convention held June 12-14, 2008; $39 million at a rally in Miami, Florida held July 11-12, 2008; and $27 million from a Chicago, Illinois rally held July 19, 2008. The RICO Defendants boast on ASD's websites of the success of these rallies as evidence of the growth and legitimacy of ASD.

38.     The financial results offered by ASD of three recent rallies also reveal that ASD accepted sales by a variety of financial transactions: checks and money orders, personal checks, cash balance upgrades, direct deposits, and bank wire transfers. At a recent rally, members waited in lines for up to 45 minutes to have money accepted by one of approximately twenty ASD representatives collecting money. It is believed that these funds were deposited in bulk into the Bank of America accounts held by the RICO Defendants.

39.     The RICO Defendants also represent on ASD's websites and in Internet video presentations how ASD allocates the money collected from ASD ad purchases and other income sources. These representations feign the legitimacy and sustainability of the ASD programs. These Internet postings misrepresent the ability of ASD to sustain its programs without the continual influx of new members and upgrade purchases by existing members. In fact, in early 2007 ASD shut down temporarily. At that time, ASD's auto-surf features, including mechanisms for members to earn rebates and obtain cash-outs, did not work as represented. For at least two separate periods in April and May of 2008, ASD's auto-surf features were unavailable. Despite this, ASD claims that it offered its members a "global credit" for the days that the ASD website was unavailable.

40.     ASD undertakes to train its members about the program through its website www.adsurfdailytraining.com. In addition, ASD, including Defendant Bowdoin, conducts weekly web conferences to communicate to members about ASD programs. In these promotional communications ASD offers information about ways that it assists members to develop their own websites to promote on ASD. ASD represents that it offers to its members

marketing advice at its sister site www.attrackmarketingsystems.com, and it has marketing CDs available containing "sizzle" messages to assist members to attract referrals.

41.    Busby, too, reaches out to members and potential members using conference calls.  In such calls, Busby has touted his success as a businessman; promoted the connection between Golden Panda Ad Builder and ASD and Bowdoin; claimed that 50-100 individuals came to the Acworth, Georgia office of Golden Panda Ad Builder each day to deposit funds with the new operation; boasted that the operation was processing 300-400 checks per day and depositing those regularly; and represented that purchasing ad packages through Golden Panda Ad Builder will create wealth for participants.

## The RICO Defendants Fraudulently Claim that ASD Provides an Advertising Service and Pays Rebates for Viewing Internet Advertisements

42.    Using ASD's websites, video presentations posted on the Internet including on You Tube, weekly web conferences, and in-person rallies, the RICO Defendants consistently make false representations to members and the public as to the business viability and legitimacy of ASD.  Defendants Bowdoin and Garner, in particular, appear on Internet videos promoting ASD.  For example, the following are some of the misrepresentations and false statements made by the RICO Defendants: (1) ASD is going to sign up over one hundred Fortune 500 companies, such as Google, Coke, Pepsi, and others, to pay for advertising on the ASD network and generate revenues to pay members' rebates; (2) ASD has a contract for the placement of three advertisements on its homepage that would generate at least $13 million per year; (3) ASD members receive timely rebate credits and cash-outs; (4) ASD is in partnership with an entity known as Ad Sales Daily and this partnership will provide an outside source of income to fund payment of member rebates; (5) ASD members will earn 125% rebate on ad packages purchased from ASD; and (6) ASD's rebate program is a "loss leader" that enables ASD to grow its participation and pay members' rebates with revenue from large commercial advertisers.  Each of these statements is false.

43.     The RICO Defendants construct a facade that ASD offers valuable, legitimate Internet advertising services.  They represent that ASD members will receive increased traffic to their websites by purchasing ad packages from ASD.

44.     The RICO Defendants also recognize that people will join ASD for purposes other than advertising their own business.  On the ASD websites, the RICO Defendants makes suggestions for websites that can be "advertised":  "For those joining ASD who do not have a personal business to advertise, you may advertise either www.paydot.com . . . or www.mobillcash.com. . . ."

45.     The RICO Defendants distort the value of the services ASD offers.  For example, the RICO Defendants mislead by representing that ASD's advertising services are comparable to Google advertising services.

46.     This veneer of legitimacy is repeated over and over again in Internet video advertisements sponsored by the RICO Defendants and by ASD representatives at rallies.  Specifically, in these advertisements, the RICO Defendants falsely claim that ASD is highly profitable, that ASD has signed up more than one hundred Fortune 500 companies as paid advertisers, and that ASD's founder, Bowdoin, has a stellar, award-winning business career.

47.     In fact, ASD does not have Fortune 500 companies as advertisers on ASD.  Rather, its advertisers are members who pay ASD with the expectation that ASD will provide the rebates and commissions ASD promises.  In other words, the revenue received from advertisers contributes to additional future obligations of ASD, in the form of a growing amount of rebates and commissions promised to ASD members.

48.     The RICO Defendants have made false claims over the Internet that ASD's business model has an "innovative rebate structure that will enable [it] to continue indefinitely."  It has claimed:

> rebates are paid from ad purchase sales of the Cash Generator, the sale of banner ads on the Cash Generator, commissions from the sale of the Ad Placement Service at our sister site "Attract Marketing

System" by Cash Generator members, sale of ebooks and any other products that ASD decides to market.

49. The RICO Defendants also represent on ASD's websites that ASD's sales figures "include new money coming into the company, as well as upgrades from cash balances used to purchase ad packages."

50. As indicia of the fraudulent nature of the schemes operated by the RICO Defendants, even though the RICO Defendants proclaim that ASD offers Internet advertising services, ASD does not appear to sell any independent products or services sufficient to generate an income stream needed to support the rebates and commissions that it promises its members. Accordingly, ASD has no apparent means to generate these promised returns, other than through continued growth of its membership and continued growth of its members' purchases.

51. ASD advertises on its website that it divides 50% of ASD's daily profits among members who have active ad packages. ASD advertises that to receive a portion of the profit as a rebate, members must only view at least 24 webpages per day, and each webpage must be viewed for 15 seconds. The RICO Defendants also encourage members to use their daily rebates to purchase more ad packages on ASD.

52. On ASD's websites, ASD refers to the amount in a member's account as a "Cash Balance," thus falsely representing that the account balance has the liquidity of cash. ASD represents that members may "cash out" account balances simply by following instructions. However, ASD also imposes disincentives for cashing out. The RICO Defendants induce members to leave earned rebates in ASD accounts as a cash balance by claiming that by doing so, members will significantly increase earnings. In this way, the RICO Defendants encourage ASD members to continue to contribute to ASD's scheme. Furthermore, members do not learn that ASD cannot live up to its promises until members attempt to cash out. Members may watch their ASD accounts grow by delaying cashing out, but the only real growth is of ASD's pyramid.

53. The RICO Defendants attempt preemptively to allay members' concerns about the viability of the ASD scheme. They make representations to ASD members that ASD will put

5% of profits in a reserve account to be used to pay the rebate when new ad package sales are extremely low. However, by the very structure of the scheme, such reserve accounts, if they actually exist, cannot enable ASD to fulfill the promised rebates. Therefore, this representation is false and/or misleading.

54. The numbers the RICO Defendants provide do not add up to anything other than false promises. For example, in the month of June 2008, the RICO Defendants claim that ASD generated over $90 million in new money and member "upgrades." To fulfill its promise to rebate 125% of that revenue, ASD would have to generate a total of $112.5 million ($90 million plus $22.5 million to cover the 25% return) in new revenue. Absent the recruitment and participation of new members, the RICO Defendants have no legitimate source to generate these funds.

55. The RICO Defendants make claims on ASD websites in an attempt to avoid liability to members:

> All payments made to ASD are considered advertising purchases, not investments or deposits of any kind. All sales are final. ASD does not guarantee any earnings or profits. Any commissions paid to Members are for the service of viewing other Member web sites and for referring Members to AdSurfDaily. All advertising purchases are non-refundable.

## ASD's Founders Have A History of Questionable Business Practices

56. Defendant Bowdoin is a central figure in the ASD schemes. Bowdoin controls and, with others, operates ASD. The RICO Defendants gain members' trust and confidence by purposefully stressing Bowdoin's alleged business acumen and long-standing reputation as a business owner and entrepreneur. These representations are, in fact, untrue.

57. A dramatic discrepancy exists between the RICO Defendants' representations of Bowdoin's past and his business acumen, as compared to the facts revealed by Bowdoin's criminal history and record of involvement in defunct corporations. The RICO Defendants present Bowdoin as an astute businessman who has received a Medal of Distinction from the President of the United States for his success as a businessman. In fact, Bowdoin has not

received such an honor and he has a history of arrests for fraud and securities violations, business failures, and has pled guilty to sale of unregistered securities.

58.     According to a verified Complaint filed by the United States Attorney for the District of Columbia, Bowdoin was arrested in Alabama for one or more felony violations related to Fraud in Connection with the Offer and Sale of Securities by an Unregistered Agent. In that case Bowdoin and several co-defendants were accused of having been promoters of a company called "Mobile International, Inc." that developed a mobile telephone system that was a cheaper alternative to the then-current cellular systems. That venture collapsed and Bowdoin and his co-defendants were charged with having sold unregistered securities to investors and while failing to state material facts to the investors that would have impacted the victims' decisions to invest. In particular, Alabama officials asserted that Bowdoin instigated a scheme by which he took money from some victims to pay off prior investors. Bowdoin resolved this criminal matter by agreeing to enter Pre-Trial Diversion with three years of supervised probation and pay restitution of $15,000. Bowdoin completed his Pre-Trial requirements and the charges were dismissed. Furthermore, on January 1, 1999, in Wilcox County, Alabama, Bowdoin pleaded guilty to one count of sale of unregistered securities and was sentenced to 1 year in prison. In this matter, Bowdoin's sentence was suspended and he was placed on 3 years supervised probation and ordered to pay restitution of $75,000.

59.     A public search on the Florida Department of State, Division of Corporations' website of registered corporations revealed that from November 14, 1983, to September 14, 2007, Bowdoin served as a Registered Agent ("RA"), President, Chief Executive Officer ("CEO") or Director of several defunct and questionable corporations: (1) RA for ReTube-Lite International, Inc., incorporated from 9/14/83 to 11/21/84 (involuntary dissolved); (2) RA for Crosby Enterprises of Lakeland, incorporated from 2/23/84 to 11/1/85 (involuntary dissolved); (3) RA for KDJ Enterprises, Inc., incorporated from 2/23/84 to 11/1/85 (involuntary dissolved); (4) RA for South Polk Investors, Inc., incorporated from 4/2/84 to 11/1/85 (involuntary dissolved); (5) RA for Ridge-Tec, Inc., incorporated from 4/2/84 to 11/1/85 (involuntary

17

dissolved); (6) RA for MI-Com, Inc., incorporated from 4/2/84 to 11/1/85 (administratively dissolved); (7) President of Creative Retailing Services, Inc., incorporated from 3/5/98 to 9/19/03 (administratively dissolved); (8) CEO of Global Tech Marketing, Inc., incorporated from 6/26/00 to 9/13/00 (administratively dissolved); (9) Director of GPS Tech, Inc., incorporated from 3/26/04 to 9/15/06 (administratively dissolved); (10) RA for GPS Development & Manufacturing, incorporated from 11/12/04 to 9/16/05 (administratively dissolved); (11) Director of EADNetwork, Inc., incorporated from 12/1/06 to 9/14/07 (administratively dissolved); and (12) Director of World Payment Systems, Inc., incorporated from 12/1/06 to 9/14/07 (administratively dissolved).

60.    Bowdoin does not appear to have earned any significant income from lawful employment in the twenty years prior to his commencement of ASD's operation.  Despite this, ASD's promoters tell prospective recruits that Bowdoin's business genius distinguishes ASD from similar Internet-based schemes.  In addition, no information about Bowdoin's record of business failures and fraud accusations is contained on ASD's website.  Nor was Bowdoin's true past mentioned to prospective members during the ASD rally at which he spoke or during conference calls that he, or others promoting ASD on his behalf, participated in during ASD's operations.  Instead, the RICO Defendants fraudulently maintain that Bowdoin operates legitimate businesses.

61.    Defendant Busby is another operator of the ASD scheme.  Busby was the Chief Executive Officer and President of Golden Panda Ad Builder, Inc. until its recent dissolution. Busby was accused by the SEC in 1997 of violating antifraud provisions of the securities laws by offering and selling investment contracts in connection with three different prime bank schemes. The SEC alleged that using misrepresentations and omissions in each of the three schemes, Busby raised money for purported trading programs in "prime bank" notes by fraudulently representing to investors that the investments were risk-free and that the ventures would pay returns ranging from 750% to 10,000%.  In total, Busby raised nearly $1 million from more than 70 investors.  None of the investors earned the exorbitant returns promised by Busby.  Busby

consented to judgment in the matter and was enjoined from future violations of various securities laws. The RICO Defendants, when promoting Busby's involvement in ASD's schemes, do not disclose such information about Busby's past involvement in fraudulent schemes.

62.     Defendant Garner is an integral operator in the ASD scheme. He purports to provide legitimate legal advice to ASD members about the legality of ASD's business. In so doing, he makes false statements about ASD and its legality. Garner affirmatively represents in a video presentation accessible on the www.asdcashgenerator.com website that ASD's program is not a Ponzi scheme. Garner also claims that ASD's continuing operation does not depend on expanding membership. Garner does not, however, identify any other sources of income other than members' fees that ASD can use to fund the promised rebates and commissions. In addition, Garner takes actions consistent with knowledge that he directs the operations of the scheme. Garner not only was involved in the development of the ASD program, serving as a director of AdSurfDaily, Inc., but he also holds himself out in a position of trust, confidence and superior knowledge by issuing a statement regarding ASD's legality. ASD and Garner make this "legality statement" available on the www.asdcashgenerator.com website.

**Bank of America Disregarded Numerous and Obvious "Red Flags" That Should Have Alerted Bank of America to ASD's Illegal Scheme, and Should Have Halted Bank of America's Facilitation of the Scheme**

63.     Historically, Ponzi schemes have not had the benefit of an affiliation with a credible and recognizable financial institution such as Bank of America, in part because financial institutions have a responsibility to avoid aiding and abetting illegal activities. The legal requirements and best practices that set the standard for banking institutions are well outlined in various government and industry publications, including the Federal Financial Institutions Examination Council's 2007 publication, "Bank Secrecy Act/Anti-Money Laundering Examination Manual." All banks and financial institutions have the burden of knowing their customers and identifying and reporting suspicious transactions. To meet that burden, and to comply with the various Bank Secrecy Act and anti-money laundering laws and regulations, banks must have four types of programs in place, known in the industry as the "four pillars" and

described in detail in the "Bank Secrecy Act/Anti-Money Laundering Examination Manual": (1) a system of internal controls to ensure ongoing compliance, (2) independent testing of Bank Secrecy Act/Anti-Money Laundering compliance, (3) designate an individual or individuals responsible for managing Bank Secrecy Act compliance, and (4) training for appropriate personnel on potentially fraudulent transactions and money laundering activities  The requirements for these pillars have been significantly strengthened over time through more strict regulations and interpretations aimed at specifically combating fraud, including cyber-fraud as committed by ASD and the RICO Defendants.  In particular, a customer identification program and customer due diligence to assist the bank in recognizing potentially suspicious transactions, is a recognized essential element of any such compliance program.  As one of the nation's largest financial institution, Bank of America surely has a highly sophisticated compliance program embodying these "four pillars".  Bank of America's program, however, failed to (1) recognize the illegitimacy and unlawful nature of ASD, (2) stop the RICO Defendants from using the bank's products and services in furtherance of illicit purposes, and (3) halt Bank of America's involvement in the scheme.

64.     Bank of America continued over many months to aid and abet the ASD scheme despite several indicators of fraud and other suspicious conduct relating to ASD and the RICO defendants, including: (1) Bowdoin's and Busby's involvement in other illegal investment schemes; (2) the well-known existence and prosecutions of online Ponzi schemes and persistent and high profile warnings from regulators; (3) funneling of money by the RICO Defendants from and to online payment systems favored by fraudulent schemes; (4) transfers of money from certain of the RICO Defendants' Bank of America accounts to seed others of the RICO Defendants' Bank of America accounts; (5) use of ASD business accounts to pay for personal items for Bowdoin; (6) deposit slips created by ASD that members used to deposit money into one or more of the RICO Defendants' Bank of America accounts; (7) many small, incoming wire transfers of funds received and deposits made using checks and money orders; (8) wire activity that is unexplained, repetitive, or shows unusual patterns; (9) payments or receipts with no

20

apparent links to legitimate contracts, goods, or services; and (10) the flow of tens of millions of dollars and thousands of deposits to a small branch in Quincy, Florida which maintained numerous accounts for the RICO Defendants. These facts, and others alleged herein, include many "red flags" of the kind specifically identified as "Money Laundering Red Flags" by the Office of the Comptroller of the Currency in its publication for bankers, "Money Laundering: A Banker's Guide to Avoiding Problems." Bank of America, however, failed to heed these clear warning signs.

65.     Bank accounts at Bank of America used in connection with ASD's activities have been seized/frozen pursuant to warrants issued by the United States District Court for the District of Columbia. According to government allegations, at the time of the seizure/freeze these Bank of America accounts contained, in aggregate, approximately $53 million.

66.     Certain Bank of America accounts are under the control and ownership of the sole proprietor Thomas A. Bowdoin, Jr., D/B/A ADSURFDAILY, 13 S. Calhoun Street, Quincy, Florida 32351. The address on this account is not a valid address.

67.     At least four business check cards in the name of Thomas A. Bowdoin, Jr., have been linked to accounts at Bank of America held by one or more of the RICO Defendants.

68.     Bowdoin not only uses Bank of America accounts held by one of more of the RICO Defendants to run ASD, but also to pay his personal expenses and to launder fraud proceeds.

69.     Numerous transactions posted to accounts held at Bank of America by one or more of the RICO Defendants have been alleged to be purchases of personal items for the benefit of Bowdoin and his family members, including purchase of two pieces of property totaling $800,000.00, purchase of $51,000 in jewelry, transfer of $177,900.12 from Bank of America accounts to satisfy a family member's mortgage, purchase of a 2008 Honda CVR for $28,607.67, purchase of Acura TSX for $33,450.30, purchase of two jet skis in the amount of $20,506.98, purchase of a boat, trailer and attachments for $23,445.00, and purchase of a Lincoln MKS for

$48,244.03. The funds for these purchases can be traced to ASD's business accounts at Bank of America.

70.     Bowdoin generates no substantial income except that which he pays himself from his operation of ASD. Bowdoin has purchased properties in Florida and South Carolina using funds he removed from the same Bank of America accounts that he used to collect the proceeds of ASD.

71.     Until recently, Golden Panda Ad Builder, Inc. was under Bowdoin's and Busby's control. The majority of the funds deposited into the Bank of America accounts used by Golden Panda Ad Builder, Inc. originated from one or more of the RICO Defendants' other accounts at Bank of America.

72.     The Bank of America accounts used by Golden Panda Ad Builder, Inc. are under the control and ownership of Busby and/or Busby's daughter, Dawn Stowers of Acworth, Georgia. The five accounts are a DBA Golden Panda Ad Builder Deposit Account, a Golden Panda Ad Builder Operating Account, a Golden Panda Ad Builder Cashout Account, and two CD accounts. Busby has affirmed he opened certain of the Bank of America accounts and that the funds in these accounts are owned by him and Golden Panda Ad Builder.

73.     Funds have been regularly transferred back and forth between the Bank of America accounts held by one or more of the RICO Defendants.

74.     The Bank of America accounts held by one or more of the RICO Defendants and central to the ASD Enterprise referred to in this Complaint are described as follows:

(a)     Account #XXXXXXXXX3650 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(b)     Account #XXXXXXXXX3016 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(c)     Account #XXXXXXXXX3553 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(d)     Account #XXXXXXXXX3605 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(e)     Account #XXXXXXXXX3634 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(f)     Account #XXXXXXXXX5949 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(g)     Account #XXXXXXXXX6896 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(h)     Account #XXXXXXXXXX6961 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(i)     Account #XXXXXXXXXX7038 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(j)     Account #XXXXXXXXXXX7070 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(k)     Account #XXXXXXXXX0192 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Deposit Account;

(1)     Account #XXXXXXXXX0200 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Operating Account;

(m)     Account #XXXXXXXXX5704 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Cashout Account;

(n)     Account #XXXXXXXXXXX1039 at Bank of America, in the name of Golden Panda Ad Builder; and

(o)     Account #XXXXXXXXXXX4188 at Bank of America, in the name of Golden Panda Ad Builder.

Multiple accounts such as these and the other conduct described herein are all common "red flags" and recognized warnings to financial institutions to investigate in order to satisfy their

obligations under the Bank Secrecy Act and Anti Money Laundering statutes that deposited funds are generated from a legitimate source of business operations.

**The RICO Defendants' Relationship with Bank of America Has Been Critical to the Growth and Success of the ASD Scheme**

75.    In its prior incarnation, ASD websites accepted payments via e-Gold and Virtual Money, online digital currency payment systems.  E-Gold has been recognized by law enforcement as a highly-favored method of payment by operators of investment scams, including pyramids, Ponzis, high yield investment programs, and other "get rich quick" schemes because of its relative anonymity and refusal to engage in chargebacks (where payment to a vendor is disallowed or reversed).  The operators of the e-Gold system were indicted in April 2007, by a Grand Jury sitting in the United States District Court for the District of Columbia, for money-laundering and for operating an unlicensed money transmitting business, and in July 2008, e-Gold operators pled guilty to various criminal charges (for some, including money laundering) in the District of Columbia.

76.    ASD discontinued using e-Gold as a means for receiving ASD members' funds shortly after publicity about the government's investigation into that operation.

77.    ASD's instructions to members regarding financial transactions refer extensively to ASD's relationship with Bank of America, offering an illusion that the financial transactions of the ASD scheme are legitimate and secure.

78.    The Bank of America branch in Quincy, Florida is the primary branch through which the RICO Defendants funnel the cash-flow from ASD.  Although ASD directs members to make deposits through any Bank of America branch, it also specifically provides the address of the Quincy, Florida branch of Bank of America.

79.    Commencing in or before November 2006, ASD and Bank of America provided ASD members the ability to deposit funds in ASD's accounts from any Bank of America branch in the United States.  The affiliation between Bank of America and the ASD scheme as reflected on deposit forms provided by ASD greatly increased the apparent legitimacy of ASD to

prospective members.  Members have made deposits at Bank of America using a pre-printed form from ASD that Bank of America accepted.  Members have identified this affiliation between Bank of America and ASD as a factor in deciding to make payments to ASD.

80.    Bank of America provides a worldwide network of branches and wire transfer facilities for the RICO Defendants to obtain funds from ASD members anywhere at any time. The RICO Defendants have taken full advantage of this relationship with Bank of America and provide specific instructions on ASD websites for wiring money for ASD ad packages to various bank accounts at Bank of America.  The ASD website lists the Account Name as AdSurfDaily, the account number, routing number, "Swift number for international wires," and the bank address as 1321 West Jefferson Street in Quincy, Florida.  The ASD website also instructs that those wiring money should inform the bank of certain information to include on the "Final Credit," including: "1. Your Full Name; 2.  Participant Account number for ASD Cash Generator and/or La Fuente Dinero accounts, whichever you are wanting to purchase Ad Packages from, … and 3.  The dollar amount you are wiring.…"  Separate account numbers are given on the ASD website for La Fuente Dinero and AdSurfDaily.

81.    The Golden Panda Ad Builder website also identifies a Bank of America account as a depository account.  The Golden Panda website states that funds can be wired to this Bank of America account to order ad packages.

82.    The RICO Defendants' relationship with Bank of America has also enabled them to manage the tremendous flow of funds received from ASD members through rallies and other fundraising activities. Bank of America has handled daily deposits totaling tens of millions of dollars from ASD rallies.

83.    The RICO Defendants have used Bank of America accounts to conduct financial transactions for ASD, including deposits made by or on the behalf of members for the purpose of purchasing ad packages, and withdrawals to pay to members rebates and/or commissions.

84.     Bank of America receives significant fees from the financial transactions conducted in connection with the ASD scheme and fees charged in transactions with ASD members.

85.     ASD informs its members that Bank of America will deduct $12 from the amount of wire transfers as a bank charge.

86.     ASD represents that when members transfer currency from Canada, Bank of America will deduct a 5% bank charge from the amount of deposit.

87.     ASD represents on ASD's websites that a member may receive "cashouts" through a Bank of America direct deposit to the ASD member's account.

88.     Solid Trust Pay is a Canada-based money transmitting and payment company that operates over the Internet.

89.     In a two-week period in or around August 2008, the RICO Defendants, singularly or jointly, wired several million dollars to Solid Trust Pay from Bank of America accounts.

90.     Because Bank of America accounts funnel money for the RICO Defendants, the other payment systems used by ASD have passed through these accounts.

91.     According to a verified Complaint filed by the United States Attorney for the District of Columbia, another bank determined through investigation that Bowdoin appeared to be operating a Ponzi scheme and for this reason that bank closed an account controlled by Bowdoin or members of his family.

92.     At several ASD rallies, prospective members attempted to purchase ad packages through the use of Visa cards.  Lines were delayed for hours because Visa rejected these attempted charges as suspicious activity.

93.     Numerous ASD members have attempted to pay for ad packages using PayPal, but PayPal would not accept transactions relating to ASD.  PayPal's written rules disallow transactions relating to "pyramid or ponzi schemes" and "certain multi-level marketing programs."

94.     Federal laws and regulations, including but not limited to the Bank Secrecy Act, 31 U.S.C. §§5311-5330, require Bank of America to file reports with federal law enforcement officials and the Department of the Treasury for suspicious activities and large currency transactions.  Specifically, a Suspicious Activity Report must be filed regarding bank transactions or attempted transactions involving at least $5,000 that the financial institution knows, suspects, or has reason to suspect the money was derived from illegal activities.  Also, it must report large cash transactions of $10,000 or more.  Bank of America should have filed reports for the tens of millions of dollars that flowed through the Bank of America accounts from November of 2006 through July of 2008.

**Related Seizure and Forfeiture Proceedings**

95.     The Bank of America accounts listed above and held by one or more of the RICO Defendants have been seized/frozen pursuant to warrants issued by the United States District Court for the District of Columbia on the basis of facts also underlying this action.

96.     The United States Attorney's Office for the District of Columbia has filed a Complaint for Forfeiture In Rem in the United States District Court for the District of Columbia on August 5, 2008, Case No:  1:08-CV-01345,  related to the funds in the above-named Bank of America accounts.  The allegations in this forfeiture complaint were verified under oath by Secret Service Special Agent Roy Dotson.  On December 19, 2008, the United States Attorney's Office for the District of Columbia filed another Complaint for Forfeiture In Rem, Case No. 1:08-CV-02205, related to property purchased with funds in the above-named Bank of America accounts and other bank accounts as part of the unlawful scheme to defraud ASD members.

97.     As a part of a federal investigation, federal agents joined ASD and conducted a variety of transactions as ASD members, successfully using the services of Bank of America as specifically advised by instructions offered on ASD websites:

- On or about July 14, 2008, a federal agent opened an "upgraded member" account with ASD. ASD directs new members either to mail a money order or cashier's check to its Florida office, or to deposit a certified check,

money order or cash at "your nearest branch of Bank of America," directly into ASD's Bank of America account and, thereafter, to fax a copy of the deposit receipt along with their membership number to ASD. On its website, ASD provides its Bank of America account number as XXXXXXXXXXXX3016. Another federal agent made a direct deposit to ASD'S Bank of America account by delivering a check to a Bank of America branch in downtown Orlando, Florida. Thereafter, a federal agent faxed a copy of the deposit receipt via facsimile to ASD's headquarters in Quincy, Florida.

- On or about July 20, 2008, a federal agent opened another "upgraded member" account with ASD from a location in the District of Columbia, also via the Internet. The next day, a federal agent made a direct deposit into ASD's Bank of America account, this time by delivering a check to the Bank of America branch at 700 13th Street, NW, Washington, DC. Thereafter, a federal agent faxed a copy of the deposit receipt from the District of Columbia to ASD's office in Florida.

98.    On August 18, 2008, AdSurfDaily, Inc. filed in Case No: 1:08-CV-01345 an Emergency Motion for Return of Seized Funds to Save its Business and Jobs with Oversight and Monitoring and/or for an Evidentiary Hearing, and Motion to Dismiss. After an evidentiary hearing, the Court denied AdSurfDaily, Inc.'s motion. In its Memorandum Opinion entered November 19, 2008, (hereinafter "Memorandum Opinion") the Court found that AdSurfDaily, Inc. failed to rebut many of the same facts as alleged herein.

99.    Similar to the present allegations, the Court found that AdSurfDaily, Inc. failed to rebut that the payment of the promised rebates and commissions to existing members could be sustained without the influx of money from new members through their purchase of ad packages. The Court held:

> Thus, ASD purports to operate a circular system:
> advertisers pay to advertise and become members, earn "rebates"

of 125% of their advertising costs by viewing (but not buying from) other advertisers' sites, and earn commissions on sales of ad packages from their personal referrals and second level referrals. Even Mr. Grayson recognized that ASD's revenue growth was not sustainable and that when it decreased, ASD would have to decrease its rebates and/or commissions. He also opined that when that happened, ASD might no longer offer a cost-effective form of advertising.

The lay testimony of Mr. Grayson belies the expert testimony of Mr. Nehra. Mr. Nehra repeatedly asserted that ASD does not "guarantee" rebates under the Terms of Service, ("ASD does not guarantee any earnings and/or rebates"), but his testimony cannot be relied upon because (1) it is contradicted by come-on statements on the ASD website and Mr. Grayson's testimony and (2) it relied solely on the written words contained in the Terms of Service without independent investigation or review of ASD's business records to ascertain how ASD operates in fact before opining. On the current record, the Court must conclude that ASD promises a return on payments, in various forms, to induce a participant (advertiser or advertiser/member) to put money into the program. When its phenomenal growth spurt stops, even Mr. Grayson can see that ASD will collapse on itself.

Memorandum Opinion at 17 (citations omitted).

100.    Supporting its finding that AdSurfDaily, Inc. could not sustain its business apart from generating funds from new members, the Court determined, similar to the present allegations, that AdSurfDaily, Inc. did not offer a legitimate product or service sufficient to sustain the business and thus, could not demonstrate a "cadre of true customers" as distinguished from the member-income-seekers.  The Court explained:

. . . [O]nly advertisers who are not members and not participants in the rebate program might be considered "true customers." Thus, the rebate program disintegrates the traditional distinction between the income opportunity seeker and the "true customer" because in ASD's business structure, not only is the member who purchases ad packages and sells ad packages through referral commissions "pay[ing] to play," but so too is the advertiser (the purchaser of ad packages) who earns rebates for viewing other advertisers' webpages on the ASD rotator.

Memorandum Opinion at 18.

101.    Based on the evidence presented, the Court concluded that "the record strongly suggests that absent continuous membership growth, ASD has no means to generate the returns that it represents it will pay to those who join its program. It thus has failed to demonstrate, on

this record, that the ASD business model constitutes a legitimate business." Memorandum Opinion at 19.

102.    The facts and alleged offenses in the related forfeiture proceedings are the same or similar to the predicate offenses in the current action.  The forfeiture proceedings allege, among other things, that the property in the Bank of America accounts listed above constitutes or is derived from proceeds traceable to, among other offenses, any offense, or conspiracy to commit such offense, that is a "specified unlawful activity" of the federal anti-money laundering statutes, including wire fraud (18 U.S.C. §1343).  In addition, that property was alleged to be involved in a money laundering offense (18 U.S.C. §§1956 or 1957).

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") ALLEGATIONS

### ASD Enterprise

103.    Based on Plaintiffs' current knowledge, the following persons associated in fact as an "enterprise" within the meaning of 18 U.S.C. §1961(4) to operate fraudulent Internet schemes including AdSurfDaily, AdSurfDaily Cash Generator, Golden Panda Ad Builder, and La Fuente Dinero:  (a) Thomas A. Bowdoin, Jr., (b) Walter Clarence Busby Jr., (c) Robert Garner, (d) AdSurfDaily, Inc., and (e) T. Andy Bowdoin, LLC.  Plaintiffs refer to this group of persons as the "ASD Enterprise."

104.    The ASD Enterprise is an organization which engages in, and whose activities affect, interstate commerce.  The ASD Enterprise solicited, accepted, and paid funds nationwide and transferred money between states.

105.    The ASD Enterprise operated from at least October 2006, up until at least August 2008, and threatened to continue longer but for the intervening government actions.

106.    While the RICO Defendants participate in and are members and part of the ASD Enterprise, they also have an existence separate and distinct from the ASD Enterprise.

107.    The ASD Enterprise provides the RICO Defendants and other unnamed co-conspirators with a system by which to operate fraudulent schemes such as ASD, to hide the

fraudulent nature of the schemes, and to profit from such schemes. The ASD Enterprise and the RICO Defendants' control of and participation in it are necessary for the successful operation of their scheme.

108.    The RICO Defendants and others control and operate the ASD Enterprise by:

(a)    advertising and marketing AdSurfDaily, AdSurfDaily Cash Generator, Golden Panda Ad Builder, La Fuente Dinero, and other schemes over the Internet and through in-person events;

(b)    soliciting members to the schemes by making material misrepresentations;

(c)    making false promises to reasonably influence members to part with money;

(d)    providing a mechanism by which members join the scheme, i.e., making a deposit to a Bank of America account by wire transfer or deposit at a physical branch of Bank America;

(e)    collecting funds at rallies and depositing the funds collected into bank accounts held by one or more of the RICO Defendants;

(f)    accepting funds from victims of the scheme;

(g)    transferring funds between various Bank of America accounts held by the RICO Defendants to seed schemes; and

(h)    accepting money from, and depositing money to, various online digital currency payment systems.

109.    Each RICO Defendant knowingly agreed to perform services of a kind which facilitated the operation of the ASD Enterprise and facilitated the RICO Defendants and others in the operation of various fraudulent schemes, including ASD.

110.    As set forth above, the ASD Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the RICO Defendants engage.

**Predicate Acts - Violations of 18 USC §§1343, 1956 and 1957**

111.    Section 1961(1)(B) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1343 (relating to wire fraud) and 18 U.S.C. §§1956 and 1957

(relating to money laundering). As set forth below, the ASD Enterprise has and continues to engage in conduct violating each of these laws to effectuate its scheme.

**Wire Fraud**

112.   The entities involved in the ASD Enterprise have: (1) formed a scheme or artifice to defraud, (2) used the United States wires or caused the use of the United States wires in furtherance of the scheme, and (3) had specific intent to deceive or defraud.

113.   For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, the RICO Defendants and other ASD Enterprise entities, also in violation of 18 U.S.C. §1343, transmitted and received by wire, matter and things.

114.   The matter and things the RICO Defendants and other ASD Enterprise entities sent or received via wire or other interstate electronic media include, but are not limited to, inter alia:

    (a)    material misrepresentations about the nature of ASD, including, but not limited to, the benefits of membership in ASD, the business acumen of the operators of ASD, and the legality of the scheme;

    (b)    deposits made by ASD members into bank accounts controlled by the RICO Defendants;

    (c)    receipts issued to members for deposits made into bank accounts controlled by the RICO Defendants;

    (d)    transfers of funds between various accounts and payment systems controlled by the RICO Defendants;

    (e)    membership information and membership upgrade requests from ASD members; and

    (f)    requests for cash-outs from ASD members.

115.   Many of the precise dates of the ASD Enterprise's fraudulent uses of wire facilities and money laundering activities have been deliberately hidden and cannot be alleged

without discovery.  Indeed, the success of the ASD Enterprise's scheme depends upon secrecy, and the ASD Enterprise has withheld details of its scheme from Plaintiffs and Class members.

116.    In addition, pursuant to and as a part of the scheme to defraud, the RICO Defendants and others in the ASD Enterprise intended to and did receive payments from Plaintiffs and other Class members that were transmitted or cleared through the use of interstate wires in violation of 18 U.S.C. §1343.

117.    The RICO Defendants' misrepresentations, acts of concealment, and failures to disclose were knowing and intentional, and were made for the purpose of deceiving Plaintiffs and Class members and obtaining property for the RICO Defendants' gain.

118.    The RICO Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above and incorporated herein were material, and Plaintiffs and Class members relied on the misrepresentations and omissions as set forth above.

**Money Laundering**

119.    The RICO Defendants conducted or attempted to conduct financial transactions knowing that the property involved in the financial transactions represent the proceeds of some unlawful activity, and the property was, in fact, derived from an unlawful activity.  The RICO Defendants conducted such financial transactions with the intent to promote the carrying on of specified unlawful activity; with knowledge that the transaction was designed to conceal or disguise the nature, location, source, ownership or control of proceeds of the specified unlawful activity; and/or with knowledge that the transaction was designed to avoid a transaction reporting requirement under State or Federal law, an indictable money laundering offense under 18 U.S.C. §1956.

120.    The RICO Defendants knowingly conducted a monetary transaction in criminally derived property in an amount greater than $10,000, which is in fact proceeds of a specified unlawful activity, an indictable money laundering offense under 18 U.S.C. §1957.

/ / /

/ / /

**Pattern of Racketeering Activity**

121.    The RICO Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§1343,1956 and 1957 as described above, within the past ten years.  In fact, the RICO Defendants have committed or aided and abetted in the commission of countless acts of racketeering activity. Each racketeering act was related, had a similar purpose, involved the same or similar members and method of commission, had similar results, and impacted similar victims, including the Plaintiffs and other members of the Class.

122.    The multiple acts of racketeering activity that the RICO Defendants committed and/or conspired to commit, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. §1961(5).

**RICO Violations**

**18 U.S.C. §1962(c)**

123.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

124.    Through the patterns of racketeering activities above, each RICO Defendant has conducted and participated in the affairs of the ASD Enterprise.

**18 U.S.C. §1962(d)**

125.    Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

126.    The RICO Defendants' conspiracy to secure money due Plaintiffs and Class members, for their own use through the fraudulent and extortionate scheme above, violates 18 U.S.C. §1962(d).

127.   Each RICO Defendant agreed to participate, directly or indirectly, in conduct of the affairs of the ASD Enterprise through a pattern of racketeering activity comprised of numerous acts of wire fraud and money laundering, and each RICO Defendant so participated in violation of 18 U.S.C. §1962(c).

## DECLARATORY AND INJUNCTIVE RELIEF

128.   The RICO Defendants' unlawful Internet auto-surfing scheme, which has used promises of substantial rebates and commissions to entice Plaintiffs and Class members to purchase ad packages and pay membership fees, will continue to cause Plaintiffs and Class members economic loss.

129.   A money judgment in this case will only compensate Plaintiffs and Class members for past losses.  It will not stop the RICO Defendants' efforts to entice continued participation in the Internet auto-surf scheme for the benefit and profit of the RICO Defendants. Neither will it cause the RICO Defendants to discontinue their methods of confiscating the money promised to Plaintiffs and Class members for rebates and commissions.  Nor will it cause Bank of America to cease its aiding and abetting of the RICO Defendants' unlawful conduct.

130.   Neither the Plaintiffs nor any individual Class member have a practical or adequate remedy, either administratively or at law, to recover these future losses.  The costs of individually pursuing such claims far exceed the amount at issue.

131.   Even a class action such as the one contemplated in this case is a monumental undertaking that cannot be mounted on a regular basis.

132.   Where multiple lawsuits are required to redress repeated wrongs, there is no adequate remedy at law and irreparable harm exists.

## CLASS ACTION ALLEGATIONS

133.   Pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), Plaintiffs bring this nationwide class action on behalf of themselves and all other persons in the United States who within the applicable statute of limitations of the date of the commencement of this action have lost any money paid to ASD.  This class seeks certification for claims for declaratory and injunctive

relief, and for damages caused by violations of RICO, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty and fraud.

134.    Excluded from the Class are all Defendants and the directors, officers, predecessors, successors, affiliates, agents, co-conspirators and employees of all Defendants, as well as the immediate family members of such persons.

135.    All Class members have suffered injury to their property by reason of all Defendants' unlawful course of conduct, in that they paid for advertising packages and membership fees in a fraudulent business.

136.    The Class is reasonably estimated to be in the tens of thousands of members, even up to or exceeding 100,000 members, and is thus so numerous that joinder of all its members is impracticable. The precise number of Class members and their addresses are unknown to Plaintiffs, but can be ascertained through appropriate discovery of all Defendants' records. Class members may be notified of the pendency of this action by publication and/or other notice.

137.    There is a well-defined community of interest in the relevant questions of law and fact affecting putative Class members. Common questions of law and fact predominate over any individual questions affecting Class members, including but not limited to whether: (1) the RICO Defendants misrepresented the nature of ASD's business; (2) the RICO Defendants misrepresented the opportunity to receive rebates from membership in ASD; (3) the RICO Defendants misrepresented the services and/or products offered by ASD; (4) the RICO Defendants engaged in wire fraud; (5) the RICO Defendants engaged in money laundering; (6) the RICO Defendants engaged in a pattern of racketeering activity; (7) the ASD Enterprise is an "enterprise" within the meaning of 18 U.S.C. §1961(4); (8) the RICO Defendants conducted or participated in the affairs of the ASD Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c); (9) the RICO Defendants conspired with each other and other unnamed co-conspirators to commit violations of the racketeering laws in violation of 18 U.S.C. §1962(d); (10) the RICO Defendants owed Plaintiffs and the Class any fiduciary duty; (11) the RICO Defendants breached their fiduciary duty to Plaintiffs and the Class; (12) Bank of America

aided and abetted the RICO Defendants' breach of fiduciary duty; (13) Bank of America aided and abetted the RICO Defendants' fraud; and (14) Plaintiffs and the Class are entitled to damages.

138.    The claims of Plaintiffs and other Class members have a common origin and share a common basis. The claims originate from the same illegal conduct alleged herein on the part of all Defendants and other unnamed co-conspirators and their acts in furtherance of the illegal conduct. Plaintiffs' claims are typical of those of the absent Class members. If brought and prosecuted individually, the claims of each Class member would require proof of many of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

139.    Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or that directly and irrevocably conflict with the interests of other Class members. Plaintiffs are willing and prepared to serve the Court and the putative Class in a representative capacity with all of the obligations and duties material thereto. Plaintiffs have retained the services of counsel, identified below on the signature page, who are experienced in complex class-action litigation and in particular actions involving consumer matters. Plaintiffs' counsel will adequately prosecute this action and will otherwise assert, protect, and fairly and adequately represent Plaintiffs and all absent Class members.

### Rule 23(b)(3)

140.    The prosecution of separate action by individual Class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the parties opposing the class. Such incompatible standards of conduct and varying adjudications on the same essential facts, proof, and legal theories would also create and allow the existence of inconsistent and incompatible rights within the Class.

141.    A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because: (1) individual claims by the Class members would be impracticable as the costs of pursuit would far exceed what any one Class

member has at stake; (2) little individual litigation has been commenced over the controversies alleged in this Complaint, and individual Class members are unlikely to have an interest in separately prosecuting and controlling individual actions; (3) the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and (4) the proposed class action is manageable.

### Rule 23(b)(2)

142.    The Defendants have acted or refused to act on grounds generally applicable to the Class, making final declaratory or injunctive relief appropriate.

### COUNT ONE – VIOLATION OF RICO, 18 U.S.C. § 1962(c)
### (AdSurfDaily, Inc., Bowdoin, Busby, and Garner)

143.    Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein.

144.    At all relevant times, Plaintiffs, Class members, and the RICO Defendants each were a "person" within the meaning of RICO, 18 U.S.C. §§1961(3) and 1964(c).

145.    At all relevant times, the RICO Defendants and others formed an association-in-fact for the purposes of defrauding the Plaintiffs and the Class. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. §1961(4).

146.    At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. §1962(c).

147.    At all relevant times, the RICO Defendants and other conspirators associated with the ASD Enterprise conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. §1961(5), in violation of RICO, 18 U.S.C. §1962(c).

148.    Specifically, at all relevant times, the RICO Defendants and other conspirators associated with the ASD Enterprise engaged in "racketeering activity" within the meaning of 18 U.S.C. §1961(1) by engaging in the acts set forth above. The acts set forth above constitute a violation of one or more of the following statutes:  18 U.S.C. §1343 (wire fraud) and 18 U.S.C.

§§1956 and 1957 (money laundering). The RICO Defendants and the other conspirators associated with the ASD Enterprise each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

149.    The acts of racketeering activity referred to in the previous paragraph constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5). The acts alleged were related to each other by virtue of common participants, a common victim (the Plaintiffs and Class members), a common method of commission, and the common purpose and common result of defrauding the Plaintiffs and the Class and enriching the conspirators at the expense of the Plaintiffs and Class members while concealing the conspirators' fraudulent activities. The fraudulent scheme continued from approximately October 2006 until approximately August 2008 and threatened to continue longer but for the intervention of the government.

150.    As a direct and proximate result of the RICO Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs and Class members have been injured in their business or property.

151.    Specifically, Plaintiffs and Class members have been injured in their business or property by loss of money paid to the RICO Defendants.

152.    As a result of their misconduct, the RICO Defendants are liable to the Plaintiffs and Class members for their losses in an amount to be determined at trial.

153.    Pursuant to RICO, 18 U.S.C. §1964(c), Plaintiffs and Class members are entitled to recover threefold its damages plus costs and attorneys' fees from the RICO Defendants.

## COUNT TWO – VIOLATION OF RICO, 18 U.S.C. § 1962(d), BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(c)
### (AdSurfDaily, Inc., Bowdoin, Busby, and Garner)

154.    Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein

155.    At all relevant times, Plaintiffs and the RICO Defendants each were a "person" within the meaning of RICO, 18 U.S.C. §§1961(3) and 1964(c).

156.    At all relevant times, the RICO Defendants and others formed an association-in-fact for the purposes of defrauding the Plaintiffs. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. §1961(4).

157.    At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. §1962(c).

158.    In violation of 18 U.S.C. § 1962(d), the RICO Defendants have, as set forth above, conspire to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of ASD enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. §1961(5).

159.    As a direct and proximate result of the RICO Defendants' violation of 18 U.S.C. § 1962(d), Plaintiffs and Class members have been injured in their business or property.

160.    Specifically, Plaintiffs and Class members have been injured in their business or property by loss of money paid to the RICO Defendants.

161.    As a result of the conspiracy associated with the ASD Enterprise, the RICO Defendants are liable to the Plaintiffs and Class members for losses in an amount to be determined at trial.

162.    Pursuant to RICO, 18 U.S.C. §1964(c), Plaintiffs and Class members are entitled to recover threefold its damages, plus costs and attorneys' fees from the RICO Defendants.

## COUNT THREE – BREACH OF FIDUCIARY DUTY
### (AdSurfDaily, Inc., Bowdoin, Busby, and Garner)

163.    Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein

164.    The RICO Defendants owe a fiduciary duty to Plaintiffs and Class members. Each RICO Defendant gained the trust and confidence of Plaintiffs and Class members by touting the reputation of Defendant Bowdoin and the assured legality and success of ASD's program.

165.    Each RICO Defendant breached the obligations and fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision. Each RICO Defendant made

representations, among other things, about the business reputation of principals of ASD, the legality of the ASD program, the ability of ASD members to earn significant rebates and commissions, and the ability of ASD members to cash-out rebates and commissions for cash. Furthermore, each RICO Defendant touted ASD's relationship with Bank of America to enhance the apparent legitimacy of the scheme and to promote the ease of financial transactions with ASD through Bank of America via wire transfers, special deposit slips to make deposits into ASD's accounts, and direct deposits for ASD members ostensibly to receive cash outs. The RICO Defendants established a fiduciary duty by building a relation of confidence to influence ASD members, by assisting and educating ASD members on ways to participate in ASD's program, and by inducing members to maintain cash balances rather than attempt to cash-out on earned rebates and commission. By so doing, the RICO Defendants undertook to provide financial advice to Plaintiffs and Class members and to hold in trust ASD members' cash balances. Each RICO Defendant breached the fiduciary duty to Plaintiffs and Class members by making unfounded promises of significant earnings in rebates and commissions, and by withholding from Plaintiffs and Class members access to money Plaintiffs and Class members paid to ASD. Plaintiffs and Class members thereby lost money that was paid to ASD.

166.    As a result of the RICO Defendants' breach of their fiduciary duty, Plaintiffs and the Class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

### COUNT FOUR – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Bank of America)**

167.    Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein

168.    The RICO Defendants owe a fiduciary duty to Plaintiffs and Class members. Each RICO Defendant gained the trust and confidence of Plaintiffs and Class members by touting the reputation of Defendant Bowdoin and the assured legality and success of ASD's program.

169.    Each RICO Defendant breached the obligations and fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.  Each RICO Defendant made representations, among other things, about the business reputation of principals of ASD, the legality of the ASD program, the ability of ASD members to earn significant rebates and commissions, and the ability of ASD members to cash-out rebates and commissions for cash. Furthermore, each RICO Defendant touted ASD's relationship with Bank of America to enhance the apparent legitimacy of the scheme and to promote the ease of financial transactions with ASD through Bank of America via wire transfers, special deposit slips to make deposits into ASD's accounts, and direct deposits for ASD members ostensibly to receive cash outs.  The RICO Defendants established a fiduciary duty by building a relation of confidence to influence ASD members, by assisting and educating ASD members on ways to participate in ASD's program, and by inducing members to maintain cash balances rather than attempt to cash-out on earned rebates and commission.  By so doing, the RICO Defendants undertook to provide financial advice to Plaintiffs and Class members and to hold in trust ASD members' cash balances.  Each RICO Defendant breached the fiduciary duty to Plaintiffs and Class members by making unfounded promises of significant earnings in rebates and commissions, and by withholding from Plaintiffs and Class members access to money Plaintiffs and Class members paid to ASD.  Plaintiffs and Class members thereby lost money that was paid to ASD.

170.    Bank of America aided and abetted, encouraged, and rendered substantial assistance to the RICO Defendants to accomplish the wrongful acts complained of herein.  In aiding and abetting and substantially assisting the commission of the acts complained of, Bank of America acted with an awareness of the RICO Defendants' wrongdoing and realized that Bank of America's conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein.

171.    Bank of America substantially assisted the RICO Defendants' breach of fiduciary duty by failing to properly investigate Defendants Bowdoin and Busby, which would have revealed prior illegal activities; by continuing to allow one or more of the RICO Defendants to

maintain Bank of America accounts after Bank of America had substantial notice of the RICO

Defendants' illegal scheme; by allowing the RICO Defendants to market and solicit members

using Bank of America's name and reputation and thus providing apparent legitimacy to the

RICO Defendants' illegal scheme; by training the RICO Defendants' employees in ways to

perpetuate the unlawful scheme; and by providing specialized mechanisms that went outside of

normal course of banking business for the deposit, receipt and withdrawal of money fraudulently

obtained from Plaintiffs and Class members.

172.    As a result of the wrongful conduct of Bank of America, Plaintiffs and the Class

have suffered and continue to suffer economic and non-economic losses, all in an amount to be

determined according to proof at trial.

## COUNT FIVE – AIDING AND ABETTING FRAUD
### (Bank of America)

173.    Plaintiffs and Class members reallege and incorporate all the foregoing

paragraphs as if set forth fully herein.

174.    Each RICO Defendants knowingly misrepresented, omitted, and/or concealed

from Plaintiffs and Class members material facts relating to the activities and legitimacy of the

ASD Enterprise, as set forth herein, including but not limited to: (1) material misrepresentations

about the nature of the ASD scheme, including, but not limited to, the benefits of "membership,"

the business acumen of the operators of ASD, and the legality of the scheme; (2) material

misrepresentations regarding the misappropriation of member funds by the RICO Defendants for

their personal use; (3) material misrepresentations about the ability of Plaintiffs and Class

members to earn and receive in the form of cash significant rebates from auto-surfing and

referral commissions; (4) material misrepresentations that members would receive timely rebate

credits and cash-outs; (5) material misrepresentations that one or more of the RICO Defendants

had a partnership with Ad Sales Daily that would provide an outside source of income to fund

payment of member rebates; (6) material misrepresentations in advertisements that members

could earn 125% on ad packages purchased; and (7) material misrepresentations that the rebate

program was a "loss leader" which enabled the ASD scheme to grow and pay members' rebates with revenue from large commercial advertisers.

175.    Bank of America aided and abetted, encouraged, and rendered substantial assistance to each RICO Defendant to accomplish the wrongful acts complained of herein.  In aiding and abetting and substantially assisting the commission of the acts complained of, Bank of America acted with an awareness of the RICO Defendants' wrongdoing and realized that Bank of America's conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein.

176.    Bank of America substantially assisted the RICO Defendants' breach of fiduciary duty by failing to properly investigate Defendants Bowdoin and Busby, which would have revealed prior illegal activities; by continuing to allow one or more of the RICO Defendants to maintain Bank of America accounts after Bank of America had substantial notice of the RICO Defendants' illegal scheme; by allowing the RICO Defendants to market and solicit members using Bank of America's name and reputation and thus providing apparent legitimacy to the RICO Defendants' illegal scheme; by training the RICO Defendants' employees in ways to perpetuate the unlawful scheme; and by providing specialized mechanisms that went outside of normal course of banking business for the deposit, receipt and withdrawal of money fraudulently obtained from Plaintiffs and Class members.

177.    As a result of the wrongful conduct of Bank of America, Plaintiffs and the Class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

### COUNT SIX – DECLARATORY AND INJUNCTIVE RELEIF
**(AdSurfDaily, Inc., Bowdoin, Busby, Garner, and Bank of America)**

178.    Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein.

179.    This claim arises under 18 U.S.C. § 1964(a), which authorizes district courts to enjoin violations of 18 U.S.C. § 1962, and 28 U.S.C. § 2201, which authorizes declaratory relief in cases subject to the district court's jurisdiction.

44

180.    As set forth in Counts One through Five above, Defendants have engaged in unlawful conduct and will continue to do so in the future.

181.    Enjoining Defendants from committing these violations in the future and/or declaring their invalidity is appropriate as Plaintiffs and the Class have no adequate remedy at law, and will, as set forth above, suffer irreparable harm in the absence of the Court's declaratory and injunctive relief.

### COUNT SEVEN – EQUITABLE ACCOUNTING
### (AdSurfDaily, Inc., Bowdoin, Busby, and Garner)

182.    Plaintiffs and Class members reallege and incorporate all the foregoing paragraphs as if set forth fully herein.

183.    The RICO Defendants are fiduciaries of Plaintiffs and the Class.  The RICO Defendants have established complicated and ever-changing procedures involving transactions with Plaintiffs and Class members.

184.    As set forth above, the RICO Defendants maintain several accounts with Bank of America.  Plaintiffs' and the Class members' money paid to purchase ad packages has been co-mingled, withdrawn, siphoned to undisclosed sources, and utilized for personal purchases by the RICO Defendants.

185.    Plaintiffs and the Class do not have an adequate remedy at law and demand an accounting by the RICO Defendants for all monies deposited and withdrawn in the Bank of America accounts held singly or jointly by any of the RICO Defendants, as well as any other accounts into which the RICO Defendants deposited money received from Plaintiffs and Class members.

**WHEREFORE**, Plaintiffs pray for a judgment in their favor:

1.    For an order certifying the Class as defined herein;

2.    For a temporary, preliminary and permanent order for injunctive relief enjoining Defendants from pursuing the practices complained of above;

3.    For a temporary, preliminary and permanent order for injunctive relief requiring Defendants to undertake an immediate public information campaign to inform members of the

general public as to its prior practices and notifying the members of the putative Class of the potential for restitutionary relief;

    4.      For judgment declaring the above practices to be violative of federal law;

    5.      For an order requiring disgorgement and restitution of Defendants' ill-gotten gains and payment of restitution to Plaintiffs and the Class all funds acquired by means of the fraudulent scheme complained of above;

    6.      For compensatory, special and general damages according to proof;

    7.      For treble damages pursuant to 18 U.S.C. §1964(c);

    8.      For an order authorizing Plaintiffs and the Class an equitable accounting;

    9.      For reasonable attorneys' fees and costs of investigation and litigation under 18 U.S.C. §1964(c);

    10.    For prejudgment interest; and

    11.    For such other and further relief as the interests of law or equity may require.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable as a matter of right.

DATED:  January 15, 2008

                              CHAVEZ & GERTLER LLP

                              Steven N. Berk (D.C. Bar No. 432-874)
                              1225 Fifteenth Street, NW
                              Washington, D.C. 20005
                              Telephone:  (202) 232-7550
                              Facsimile:  (202) 232-7556

                              Mark A. Chavez (To Be Admitted *Pro Hac Vice*)
                              Lisa Fialco (To Be Admitted *Pro Hac Vice*)
                              42 Miller Avenue
                              Mill Valley, CA  94941-1904
                              Telephone:  (415) 381-5599
                              Facsimile:  (415) 381-5572

BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
Andrew S. Friedman (To Be Admitted *Pro Hac Vice*)
Francis J. Balint, Jr. (To Be Admitted *Pro Hac Vice*)
Kimberly C. Page (To Be Admitted *Pro Hac Vice)*
2901 N. Central, Suite 1000
Phoenix, Arizona  85012-2730
Telephone:  (602) 776-5902
Facsimile:   (602) 274-1199

SCHNEIDER WALLACE
COTTRELL BRAYTON KONECKY LLP
Todd M Schneider (To Be Admitted *Pro Hac Vice*)
Garrett W. Wotkyns (To Be Admitted *Pro Hac Vice*)
180 Montgomery Street, Suite 2000
San Francisco, CA 94104-4207
Telephone:  (415) 421-7100
Facsimile:   (415) 421-7105

Attorneys for Plaintiffs Mike Collins, Frank Greene,
Natures Discount, and the Proposed Class